Chief Judge Conway (dissenting).
I agree with Judges Dye and Desmond for affirmance.
It seems to me that this case was decided by the Deputy Comptroller before he came to the decision-rendering stage. What the decision had to be was conclusively determined by his own finding. He found as a fact that the activities of the deceased immediately prior to his cardiac affliction, all of which took place in the performance of duty, [1] ‘ precipitated the attack of coronary occlusion resulting in his death.”
*272 The statute awards accidental death benefits if “ the comptroller shall determine, on the basis of the evidence,” that the deceased ‘[1] Died * * * as the natural and proximate result of an accident sustained in the performance of duty * *
The Deputy Comptroller tells us that the activities of the deceased “ precipitated ” the attack, and few if any words could he have chosen for a more decisive indication of cause and effect. Webster’s New Collegiate Dictionary (1953) defines the verb ‘ ‘ precipitate ’ ’ thus:. “ 1. To throw or dash headlong; cast or hurl down, as from a precipice. 2. To move very rapidly; to urge or press on with haste or violence; to cause to happen suddenly, unexpectedly, or too soon * *
I will not assume that the Deputy Comptroller had insufficient vocabulary to express his findings. He found that the deceased’s heart attack was urged on with haste or pressed on with violence or caused suddenly or unexpectedly by duties he was performing as a most integral part of his job. If we need not now hold that the deceased died “ as the natural and proximate result of an accident sustained in the performance of duty”, then we can never in any case hold that a man who breathes his last breath because of a heart attack leaves anything by way of right against his employer for it, because it could not be held to be an occurrence in the course of his employment. That of course is contra numerous of our cases, which have had sufficient citation in the opinions of Judges Dye and Fulb to obviate repetition here. Were this a question of evidence, I would not disturb the conclusion; but the evidence invited a finding that the deceased’s activities did cause the occlusion, and the Deputy Comptroller could not and did not resist such finding. The statute does not admit, immediately thereafter, of the conclusion that deceased ‘ ‘ did not sustain an accident. ’ ’ The statute does not license the hearing officer to rewrite the dictionary.
The fire and deceased’s activities during it were as much a cause of his death as had a tree fallen on him or the flames taken hold of him. It would be no answer to say that a younger and faster man could have eluded the falling tree or reached water in time. So it is no answer to say that this man would have survived had his heart been a bit stronger. Had the State any physical requirements to impose upon those fighting forest fires, it should have insured that all such employees fulfilled them. *273 We are not told that the deceased concealed his previous cardiac difficulties. If a man is permitted to confront duties which may constitute a strain upon him, the permitter should not punish the man’s widow because he executed those duties in disregard of the strain. The State does not contend that the deceased should have stood still at the bottom of the hill and watched the fire spread; it permitted him to function as a Forest Banger and could not then contemplate that he would not perform duties as such.
I find it difficult to appreciate the majority’s accentuation of the fact that this was deceased’s “ usual customary work, voluntarily undertaken ”. (Italics supplied.) By that it is not to be understood that he was a “ volunteer fireman” with the choice of going to the fire or not, as his whim dictated. It was deceased’s assigned task to be at those fires. On the day in question he had just begun his afternoon meal when his special radio — and he had one in his home and one in his truck with the latter in operation “ all times ” — called him to attend the fire in question. The call came from an observer whose duty it was to make such calls. Had deceased refused to attend the fire he might have jeopardized his position. There was nothing ‘ ‘ voluntary ’ ’ about his being there.
If ‘[1] voluntarily undertaken ’ ’ be read as an allusion to the fact that no one compelled the deceased to engage in such occupation, the answer is that no one in this country is compelled to work in any civilian occupation. That is no ground for denying accidental death benefits to a victim’s survivor. If a man did not build skyscrapers, or tunnels, or unload ships, he would not have fallen 40 stories, or drowned, or been crushed by a defective boom. So a peace officer would not have been shot by a thief if he had taken employment that did not compel him to pursue one. Whatever benefits there be for the survivors of such men are not afterwards denied because the misfortune that ensued was a possibility from the beginning.
Some occupations are sedentary; others involve physical labors. The health of a given individual may be below par, but nonetheless quite adequate to keep him at his job. The State’s own expert testified that it is not at all rare to advise a man who has had cardiac difficulties to return to his “ previous occupation ” and that heavy exertion is not uniformly prohibited; *274 that the course “ would have to be left to the individual cardiologist ”; that it depends on the individual’s personality and makeup; that “ there are people who, if you limit them too much, you are doing more harm to them than as though you allow them to go ahead.” And the same doctor, testifying, we should remember, for the State, said of the deceased: “ This man then did well, being back at work and. carrying on his activities until the day in question, when, after attending several fires and climbing a steep hill, he collapsed.”
The advice that the deceased received and his own judgment in appraising it obviously impelled him to gauge the possibilities and to conclude that the job was not too much for him. No one can avoid the inference that the deceased felt himself able to continue his usual duties; to draw a contrary inference is to say that he went back to work with the intention of overtaxing his heart. Certainly this man was at work voluntarily; so was every man whose survivor has received accidental death benefits. Death is always brought about by the failure of some indispensable part of the being’s anatomy; the question always is: what brought on the failure? This man was not at home in bed, concluding an inactive day, when his heart gave out; he was in the very process of executing his duties. His end was brought about in the performance of those duties, a performance compelled by an accident of circumstance: “ a nasty, mean, forest fire”. That is the finding, and the conclusion of law thereafter constructs itself. The scheme of the statute, upon such finding, leaves no room thereafter for discretion; hence the reversal proposed by the majority does not amount to mere approval of a discretion lodged by statute. It amounts to the judicial delegation of legislative power to an agency. Our function is not so comprehensive, In my judgment we have no course but to affirm.
Judges Froessel, Van Voorhis and Burke concur with Judge Fuld; Chief Judge Conway and Judges Desmond and Dye dissent in separate opinions in which each concurs.
Order reversed, etc.